**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS
DANVILLE DIVISION**

| | |
|---|---|
| In re: ) <br> ) <br> ) <br> GENE THOMAS HARDWICK, ) <br> ) <br>                   Debtor. ) <br> ) <br> ) <br> GENE THOMAS HARDWICK, ) <br> ) <br>                   Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> LONGVIEW STATE BANK, ) <br> ) <br>                   Defendant. ) <br> ) | Chapter 11 <br><br> Case No. 11-91237 <br><br><br><br><br><br> Adversary Proceeding No. _____ |

**ADVERSARY COMPLAINT AGAINST LONGVIEW STATE BANK
AND OBJECTION TO CLAIM PURSUANT TO FEDERAL RULE OF
BANKRUPTCY PROCEDURE 3007(b)**

Now comes Plaintiff, Gene Thomas Hardwick ("Plaintiff" or "Debtor"), the debtor and debtor-in-possession in the above-captioned case, by and through his undersigned counsel, Meltzer, Purtill & Stelle LLC, and for his Adversary Complaint and Objection to Claim against Longview State Bank, states as follows:

**PROCEDURAL BACKGROUND AND PARTIES**

1.      On June 28, 2011 (the "Petition Date"), Debtor filed his voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1531 (as amended, the "Bankruptcy Code"), commencing the above-captioned Chapter 11 case.

2.      Debtor continues to operate his business and manage his properties as debtor-in-possession pursuant to sections 1107(c) and 1108 of the Bankruptcy Code.

3. Debtor is an individual residing in Champaign, Illinois.

4. Defendant, Longview State Bank ("Longview"), is an Illinois state chartered commercial bank with its principal place of business in Sidney, Illinois.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. § 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K) and (O).

6. This adversary proceeding is commenced pursuant to Rules 3007(b) and 7001(1) of the Federal Rules of Bankruptcy Procedure.

## FACTUAL ALLEGATIONS

7. Debtor is a 69-year old licensed architect who, for the past several decades, has been engaged in designing, developing and constructing residential and commercial structures primarily in and around Champaign, Illinois.

### The Student Housing Project

8. In or about October 2006, Debtor acquired a parcel of real property known as 611 East Park Street, Champaign, Illinois (the "Student Housing Property") for a contract price of $500,000, plus approximately $25,000 in closing costs, with the intention of developing that property as a 64-unit apartment building primarily for graduate students at the University of Illinois (the "Student Housing Project").

9. In or around February 2007, Debtor met and became acquainted with an individual named David K. Grace ("Grace"), the then President of Longview.

10. Although Debtor and Longview had no prior banking or lending relationship, when Grace learned of the Student Housing Project, he indicated to Debtor that Longview was extremely interested in financing the Student Housing Project.

11. After several months of discussions and negotiations, on or about July 19, 2007, Debtor and Longview entered into a loan agreement whereby Longview agreed to loan Debtor the sum of $3,900,000 in connection with the Student Housing Project (the "Student Housing Loan Agreement"). A true and accurate copy of the fully executed June 19, 2007 promissory note setting forth the terms of the Student Housing Loan Agreement is attached hereto as **Exhibit A**.[1]

12. The stated purpose of the Student Housing Loan Agreement was to "construct a 64 unit apartment building @ 611 East Park Street Champaign, Ill."

13. As security for the Student Housing Loan Agreement, Debtor executed, among other security agreements and mortgages, a first-priority mortgage dated June 19, 2007 in favor of Longview on the Student Housing Property.

14. The Student Housing Project was designed to pay for itself, including principal and interest payments under the Student Housing Loan Agreement, via rents and income once construction was completed.

15. Soon after the execution of the Student Housing Loan Agreement in July 2007, Debtor began initial work with respect to the Student Housing Project and continued such work until approximately March 2008, at which time Longview ordered Debtor to cease work.

---

[1] All loan documents filed herewith as Exhibits were obtained through the discovery process in the state court foreclosure proceedings between Debtor and Longview. Accordingly, Debtor only represents that these Exhibits are true and accurate copies of the loan documents as produced by Longview to Debtor.

3

**The Tuscola Project**

16. In or about February 2007, Grace informed Debtor of an opportunity to purchase certain property known as 600 E. Ficklin St., Tuscola, Illinois (the "Tuscola Property") and develop that property as multi-family housing for area residents (the "Tuscola Project").

17. Grace told Debtor that Longview was extremely interested in financing the Tuscola Project and promised Debtor that Longview would fully fund the Tuscola Project's $5,300,000 cost, including, without limitation, the purchase of the land, construction, financing and associated startup costs, in return for a security interest in the Tuscola Property.

18. On or about March 9, 2007, Debtor and Grace attended a public auction of the Tuscola Property, at which time Debtor made a deposit to acquire the Tuscola Property for a contract price of approximately $260,000, plus closing costs.

19. On or about April 13, 2007, Debtor and two business associates, Edward Boutilier and Chris Robinson, formed the corporation known as BRH Properties, Inc. ("BRH") to construct, own and manage the Tuscola Project.

20. On or about April 30, 2007, Longview provided an initial advance loan to BRH in the sum of $450,000 for use to close on the purchase of the Tuscola Property and for project research, development, and construction start-up costs associated with the Tuscola Project.

21. Soon after acquiring the Tuscola Property, BRH moved forward with research, development work, and initial construction work on the Tuscola Project.

22. Throughout the Spring and Summer of 2007, as BRH moved forward with work on the Tuscola Project, Grace and Longview repeatedly reiterated their commitment to the Tuscola Project and their promise that Longview would fund the full $5,300,000 Tuscola Project cost. Indeed, at numerous times during this period, Longview assured Debtor that the remainder

4

of the $5,300,000 million loan for the Tuscola Project was "a slam dunk" and encouraged BRH to move forward with construction on the Tuscola Project. However, upon information and belief, Longview needed other banks to participate in the loan in order to fully fund construction of the Tuscola Project.

23. The Tuscola Project was designed to pay for itself, including principal and interest payments on Longview's promised $5,300,000 loan, via rents and income once construction was completed.

**Longview's Improper Transfers and Illegal Tying Arrangement**

24. Despite Longview's promises and assurances, in or about October 2007, Longview informed BRH that it was unable to retain other lenders to participate in the $5,300,000 loan to BRH to fund the Tuscola Project. And, as a result, Longview was unable to advance the loan to fund the Tuscola Project at that time.

25. On account thereof, Grace, on behalf of Longview, ordered Debtor to begin transferring loan proceeds advanced under the Student Housing Loan Agreement for use in connection with the Tuscola Project.

26. Debtor initially refused Longview's order to transfer proceeds advanced under the Student Housing Loan Agreement to the Tuscola Project, explaining that he had no obligation to transfer the proceeds of his personal loan to BRH's Tuscola Project, especially given that the Student Housing Loan Agreement was made with Debtor personally (whereas the Tuscola Project was owned by BRH).

27. Despite Debtor's refusal, Longview repeated its insistence that Debtor transfer proceeds from the Student Housing Loan Agreement to the Tuscola Project, and, in fact,

5

Longview conditioned any subsequent advances to BRH for the Tuscola Project on Debtor's transfer of the loan proceeds from the Student Housing Loan Agreement to BRH.

28. In light of Longview's representations, instructions, and orders, Debtor believed that the only way to save either the Tuscola Project or the Student Housing Project was to accede to Longview's demands.

29. As a result, between November 2007 and May 2009, Debtor complied with Longview's orders and personally transferred approximately $750,000 of proceeds advanced under the Student Housing Loan Agreement to BRH for the Tuscola Project.

30. In or about March 2008, Longview ordered Debtor to cease all construction and other work on the Student Housing Project and to focus all of his efforts on continuing and completing the Tuscola Project with BRH.

31. In light of Longview's orders, coupled with the fact that Longview's mandated transfers to the Tuscola Project had deprived Debtor of sufficient funds to complete the Student Housing Project, Debtor complied with Longview's instructions to cease work on the Student Housing Project. Longview's order to freeze work on the Student Housing Project remained in place for more than a year and half, until late 2009.

32. In or about June 2009, Longview continued ordering Debtor to transfer proceeds advanced under the Student Housing Loan Agreement to the Tuscola Project because BRH was running out of funds. And, again, Longview conditioned the forthcoming loan to BRH for the development of the Tuscola Project on Debtor's transfer of the proceeds from the Student Housing Loan Agreement to BRH.

33. Debtor again refused Longview's instructions because, at that point, he believed that any further transfers from the Student Housing Loan Agreement to the Tuscola Project

6

would destroy any remaining chance to complete the Student Housing Project or perform under the Student Housing Loan Agreement.

34. Nevertheless, despite Debtor's refusal, Longview, *unilaterally and without Debtor's approval, knowledge, or authorization*, advanced approximately $100,000 in proceeds under the Student Housing Loan Agreement and transferred those proceeds to the corporate bank account of BRH for use on the Tuscola Project.

35. In or about July 2009, Longview notified Debtor and BRH that it had not been able to find any other lenders to participate in the Tuscola Loan, and that Longview would only be able to provide BRH with a loan in the sum of $4,000,000 for the Tuscola Project, rather than the $5,300,000 it had previously promised. Longview represented that this was a "take it or leave it" offer.

36. Longview, Grace, BRH and Debtor were at all times aware that $4,000,000 was not enough capital to complete construction of the Tuscola Project.

37. With no other alternatives available and certain that refusing Longview's $4,000,000 loan would guarantee the Tuscola Project's and the Student Housing Project's failure, Debtor and BRH agreed to enter into a $4,000,000 loan with Longview.

38. As a result, on or about July 31, 2009, BRH and Longview entered into a loan agreement (the "Tuscola Loan"), whereby Longview agreed to loan BRH the sum of $4,000,000 in connection with the Tuscola Project. A true and accurate copy of the promissory note reflecting the Tuscola Loan is attached hereto as **Exhibit B**.

39. As security for the Tuscola Loan, Debtor executed several mortgages in favor of Longview, including, without limitation, mortgages on (i) the Tuscola Property, (ii) an office building located at 9 & 11 East University Avenue, Champaign, Illinois, on a forty-eight unit

apartment building located at 407 East University Avenue, Champaign, Illinois ("407 East University"), and (iii) an eighteen-unit apartment building located at 409 West Green Street, Champaign, Illinois.

40.     As further security for the Tuscola Loan, Debtor executed a certain unlimited Commercial Guaranty of BRH's indebtedness to Longview (the "Guaranty"). A true and accurate copy of the Guaranty is attached hereto as **Exhibit C**.

**The Student Housing Project Fails**

41.     At Longview's order, and due to the lack of available capital from Longview, development and construction at the Student Housing Project remained frozen from approximately March 2008 through October 2009.

42.     On or about November 1, 2009, Longview ordered that work on the Student Housing Project resume.

43.     Also, on or about November 1, 2009, Longview returned certain portions, but not all, of the Transferred Funds to the Student Housing Project. But, at least $250,000 of the Transferred Funds were not returned by Longview to the Student Housing Project or Debtor, and such funds have at no time been returned to Debtor or been otherwise made available for the Student Housing Project.

44.     In response to Longview's order to resume work on the Student Housing Project, Debtor informed Longview that the next construction step was to dig and pour concrete footings and foundation walls, and that such work would be extremely expensive and/or impossible to do in winter. As such, Debtor indicated, and Longview agreed, that such work would resume in the Spring of 2010.

45. However, in or about February 2010, before such work could resume, Longview froze the Student Housing Loan Agreement and the associated bank account for the Student Housing Loan Project, making it impossible for the Debtor to do any further work in connection with the Student Housing Project.

46. Longview has at no time since February 2010 un-frozen the Student Housing Loan Agreement or the associated bank account for the Student Housing Project.

47. The Student Housing Project has not been completed and no rental income has been received in connection with that Project. As a result, there has been no source of income to make payments on the Student Housing Loan Agreement, and a substantial balance has accrued thereon.

48. On or about October 12, 2010, Longview initiated foreclosure proceedings with respect to the Student Housing Property.

**The Tuscola Project Fails**

49. As of late summer of 2009, construction at the Tuscola Project was approximately seventy percent (70%) complete.

50. Following the Tuscola Loan, BRH moved forward with work on the Tuscola Project throughout the end of 2009 and the beginning of 2010.

51. Throughout the end of 2009 and the beginning of 2010, however, BRH desperately sought outside funding for the remaining $1,300,000 that Longview had originally promised and that BRH needed to complete the Tuscola Project, as well as amounts for additional costs caused by construction delays.

9

52. Despite obtaining limited outside financing, by approximately August 2010, with construction of the Tuscola Project not yet complete, the available monies under the Tuscola Loan were exhausted and no additional monies were made available by Longview.

53. As a result, construction on the Tuscola Project came to a halt in August 2010. Debtor, however, personally funded the necessary winterization and cleaning of the property and completed two model units and landscaping. This additional work cost Debtor $85,000.

54. On or about October 12, 2010, Longview initiated foreclosure proceedings with respect to the Tuscola Property.

55. As of the date of this motion, the Tuscola Project has not been completed and no rental income has been received in connection with that Project. And, in March 2012, the deed on the Tuscola Property was transferred to Longview by an agreed order entered by this Court. Subsequently, the BRH Chapter 11 case was dismissed pursuant to an agreed order entered by this Court on May 24, 2012.

56. As a result of Longview's illegal lending practices, both the Student Housing Project and the Tuscola Project failed, and Debtor and BRH were forced to file their current Chapter 11 cases.

### - COUNT I -
### VIOLATION OF THE ANTI-TYING PROVISIONS OF
### THE U.S. BANK COMPANY HOLDING ACT, 12 U.S.C. § 1972, *et seq*.

57. Debtor repeats and realleges Paragraphs 1 through 56 as if fully set forth herein.

58. By conditioning the subsequent extension of the Tuscola Loan to BRH on Debtor's transfer of certain of the Student Housing Loan Agreement proceeds to BRH for use on the Tuscola Project, Longview orchestrated an illegal tying arrangement in violation of the U.S. Bank Company Holding Act, 12 U.S.C. § 1972, *et seq*. (the "Tying Arrangement").

59.     The Tying Arrangement was non-traditional in the banking industry, because Longview used its leverage to force Debtor to comply with an unusual demand for the direct benefit of Longview and BRH.

60.     Longview benefitted from the Tying Arrangement because the transfers from Debtor to the Tuscola Project temporarily alleviated the need for Longview to extend monies under the Tuscola Loan to protect Longview's lien in the unfinished project. In essence, Longview used Debtor as a substitute source of financing for the Tuscola Project while Longview attempted to obtain loan participants and line up funding in connection with the Tuscola Loan.

61.     Debtor was unable to complete the Student Housing Project due to a lack of financing and additional mortgage debt on the Student Housing Project caused by the Tying Arrangement and because Longview required that the monies needed to complete the Student Housing Project be expended on an unrelated project. Accordingly, Debtor was damaged by the Tying Arrangement.

WHEREFORE, Plaintiff/Debtor, Gene Thomas Hardwick, prays that this Court enter judgment in his favor and against Defendant, Longview State Bank, in an amount to be determined at trial, plus treble damages pursuant to 12 U.S.C. § 1975, pre- and post-judgment interest, costs, attorneys' fees and all additional sums accruing through the date of judgment, and award him such other, further and different relief as this Court deems just.

## - COUNT II -
## TRESPASS TO CHATTELS / CONVERSION

62.     Debtor repeats and realleges Paragraphs 1 through 61 as though fully set forth herein.

63. Pursuant to the Student Housing Loan Agreement, Debtor had an absolute and unconditional right to immediate possession of all proceeds advanced under the Student Housing Loan Agreement and to use such proceeds in connection with the Student Housing Project.

64. In or about June and July 2009, Longview unilaterally and without Debtor's approval, knowledge, or authorization transferred approximately $100,000 of Debtor's monies obtained under the Student Housing Loan Agreement to the corporate bank account of BRH for use in connection with the Tuscola Project (the "Converted Funds").

65. In addition, between November 2007 and May 2009, Debtor, at Longview's instruction and over Debtor's numerous objections, advanced approximately $750,000 of Debtor's monies obtained under the Student Housing Loan Agreement to the corporate bank account of BRH for use in connection with the Tuscola Project (the "Transferred Funds", and together with the Converted Funds, the "Funds").

66. Debtor had an absolute and unconditional right to the immediate possession and use of the Transferred Funds that Longview forced Debtor to transfer to the Tuscola Project.

67. Debtor likewise had an absolute and unconditional right to the immediate possession and use of the Converted Funds that Longview removed from Debtor's account and moved to the Tuscola Project.

68. By forcing Debtor to transfer, or itself transferring (without Debtor's approval, knowledge, or authorization), the Funds to the Tuscola Project, Longview assumed control, dominion and ownership of the Funds, which at all times constituted the Debtor's property.

69. Debtor made repeated demands on Longview for possession of the Funds and for the return of the Funds, with interest paid thereon.

70. Although Longview returned a portion of the Funds to Debtor in November 2009, Longview has not returned, in the aggregate, approximately $185,000 (plus interest in the amount of $65,000) of the Funds to Debtor.

71. The Funds were held in an identifiable and segregated account and, as such, were specific and identifiable chattel.

72. On account of Longview's assumption of control over the Funds, the Student Housing Project was unable to be completed due to a lack of financing. Accordingly, Debtor was damaged by Longview's assumption of control and dominion of the Funds.

WHEREFORE, Plaintiff/Debtor, Gene Thomas Hardwick, prays that this Court enter judgment in its favor and against Defendant, Longview State Bank, in an amount to be determined at trial, plus pre- and post-judgment interest, costs, attorneys' fees and all additional sums accruing through the date of judgment, and award him such other, further and different relief as this Court deems just.

### - COUNT III -
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

73. Plaintiff repeats and realleges Paragraphs 1 through 72 as though fully set forth herein.

74. As owner of the Student Housing Property, Debtor had a valid and legitimate expectancy that he would be able to use the Student Housing Project for commercial gain.

75. Given his experience as an architect and developer, Debtor had a valid and legitimate expectancy that he would be able to successfully develop and complete construction of the Student Housing Project.

76. Given the proximity of the Student Housing Project to the University of Illinois, and the Student Housing Project's use as student housing, Debtor had a valid and legitimate

expectancy that, upon the completion of the Student Housing Project, Debtor would be able to rent a sufficient number of units at the Student Housing Project in order to (a) provide a cash stream to repay the Student Housing Loan Agreement and (b) generate additional profits for his own use and enjoyment.

77. Longview was at all relevant times aware of Debtor's valid and legitimate expectations that (a) he would be able to use the Student Housing Project for commercial gain, (b) he would be able to successfully develop and complete construction of the Student Housing Project, and (c) he would be able to rent a sufficient number of units at the Student Housing Project in order to provide a cash stream to repay the Student Housing Loan Agreement.

78. Longview knowingly and intentionally deprived Debtor of sufficient funds to complete the Student Housing Project by forcing Debtor to transfer, or itself transferring, approximately $850,000 of the Student Housing Loan Agreement's proceeds to the Tuscola Project.

79. Longview knowingly and intentionally deprived Debtor of sufficient funds to complete the Student Housing Project by at all times refusing to return, in the aggregate, approximately $185,000 (plus collective interest on these Funds in the amount of $65,000) of the Funds to Debtor or otherwise making said sums unavailable to Debtor under the Student Housing Loan Agreement.

80. Longview knowingly and intentionally ordered that all work on the Student Housing Project freeze between approximately March 2008 and October 2009.

81. As a direct and proximate result of Longview's knowing and intentional actions, Debtor (a) was and remains unable to use the Student Housing Project for commercial gain and may lose the Student Housing Property in a foreclosure proceeding filed by Longview, (b) was

and remains unable to successfully develop and complete construction of the Student Housing Project, and (c) was and remains unable to rent a sufficient number of units at the Student Housing Project in order to provide a cash stream to repay the Student Housing Loan Agreement.

82. As a direct and proximate result of Longview's actions, Debtor has been deprived of the substantial prospective economic advantage relative to Student Housing Property and the Student Housing Project.

WHEREFORE, Plaintiff/Debtor, Gene Thomas Hardwick, prays that this Court enter judgment in its favor and against Defendant, Longview State Bank, in an amount to be determined at trial, plus pre- and post-judgment interest, costs, attorneys' fees and all additional sums accruing through the date of judgment, and award him such other, further and different relief as this Court deems just.

## - COUNT IV -
## BREACH OF FIDUCIARY DUTY

83. Plaintiff repeats and realleges Paragraphs 1 through 82 as though fully set forth herein.

84. By exercising control and dominion over Debtor's finances, business, and decision-making, Longview became a fiduciary of Debtor. Longview's exercise of dominion and control over Debtor is apparent from, without limitation, the following:

    a. Longview spent and allocated Debtor's money without Debtor's knowledge, approval, or authorization and, in other instances, Longview used its financial leverage to force Debtor to transfer advances on the Student Housing Loan Agreement to fund expenses on the Tuscola Project;

    b. Longview's president formally met with Debtor on a weekly basis to discuss Debtor's business activity and to provide Debtor with instructions for running his business, thereby usurping the power of Debtor to make his own business decisions;

15

   c. Longview exercised complete control over Debtor's finances by, among other things, (i) directing monies out of Debtor's accounts without Debtor's authorization to accounts of Longview's choosing, and (ii) refusing and failing to send account statements and loan documents to Debtor, as Longview had complete control over Debtor's finances pertaining to the Student Housing Property and BRH; and

   d. Longview orchestrated Debtor's suspension of its construction and development efforts at the Student Housing Project.

85. Longview breached its fiduciary duty to Debtor by diverting Debtor's monies, without authority, to the Tuscola Project. Longview benefitted from this diversion of the Funds because the transfers from Debtor to the Tuscola Project temporarily alleviated the need for Longview to extend monies under the Tuscola Loan and protected Longview's lien on the unfinished project. In essence, Longview used Debtor as a substitute source of financing while Longview attempted to obtain loan participants and line up funding in connection with the Tuscola Loan.

86. Longview, by way of this diversion of Debtor's monies, actively exploited Debtor for Longview's own benefit.

87. On account of Longview's breach of its fiduciary duty to Debtor, the Student Housing Project was unable to be completed due to a lack of financing. Accordingly, Debtor was damaged by Longview's breach.

WHEREFORE, Plaintiff/Debtor, Gene Thomas Hardwick, prays that this Court enter judgment in its favor and against Defendant, Longview State Bank, in an amount to be determined at trial, plus pre- and post-judgment interest, costs, attorneys' fees and all additional sums accruing through the date of judgment, and award it such other, further and different relief as this Court deems just.

16

## - COUNT V -
## OBJECTION TO CLAIM

88.     Plaintiff repeats and realleges Paragraphs 1 through 87 as though fully set forth herein.

89.     Based on the allegations and causes of action set forth herein, Debtor, pursuant to Rule 3007(b) of the Federal Rules of Bankruptcy Procedure, hereby objects to Longview's proof of claim filed against Debtor's estate in this proceeding ("Proof of Claim").  A true and accurate copy of the Proof of Claim is attached hereto as **Exhibit D**.

90.     Debtor further objects to the Proof of Claim to the extent it seeks the recovery of any illegal, unlawful, inequitable, or unreasonable, loan charges, interest, penalties, or other fees in connection with the Student Housing Loan Agreement, the Tuscola Loan, or the Guaranty.

WHEREFORE, Plaintiff/Debtor, Gene Thomas Hardwick, prays that (i) all damages awarded on account of the causes of action set forth herein be applied and set off against the Proof of Claim, (ii) the Proof of Claim be reduced on account of any inequitable or unlawful loan charges or fees sought in the Proof of Claim, and (iii) this Court grant such other, further and different relief as this Court deems just.

Dated: May 25, 2012

                                        **GENE THOMAS HARDWICK**


                                        By: /s/  Forrest B. Lammiman
                                            One of His Attorneys

Forrest B. Lammiman (ARDC No. 6208632)
David L. Kane (ARDC No. 6277758)
**MELTZER, PURTILL & STELLE LLC**
300 South Wacker Drive, Suite 3500
Chicago, Illinois 60606
(312) 987-9900
(312) 987-9854 (facsimile)